UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| D.L., a Minor, | : | Case No. 1:19-cv-00184 |
| c/o Gerhardstein & Branch | : | |
| 441 Vine Street, Suite 3400 | : | Judge Susan J. Dlott |
| Cincinnati, OH 45202 | : | |
| | : | |
| and, | : | |
| | : | |
| DIONDRE LEE, Individually and as | : | **FIRST AMENDED CIVIL** |
| the natural parent and next friend of | : | **COMPLAINT AND JURY DEMAND** |
| D.L., his minor child, | : | |
| c/o Gerhardstein & Branch | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| and, | : | |
| | : | |
| ANTIONETTE LEE, Individually and | : | |
| as the natural parent and next friend | : | |
| of D.L., her minor child, | : | |
| c/o Gerhardstein & Branch | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| KEVIN KROGER | : | |
| c/o City of Cincinnati | : | |
| 301 Ezzard Charles Dr. | : | |
| Cincinnati, OH 45202 | : | |
| *Individually and in his official capacity* | : | |
| *as an employee of the City of Cincinnati* | : | |
| | : | |
| and | : | |
| | : | |
| CITY OF CINCINNATI, OHIO | : | |
| 801 Plum St. | : | |
| Cincinnati, OH 45202 | : | |
| | : | |

**Defendants.**

1

## I. INTRODUCTION

1. This civil rights action challenges as excessive force the tasing of a 14-year-old nonviolent Black child. D.L. was outside talking to a friend when the two boys were approached by Officer Kevin Kroger for no reason other than that they were Black boys. After D.L. expressed his desire not to be detained by Officer Kroger and tried to leave, Officer Kroger ran behind him and without warning or provocation tased D.L. twice. D.L. had to be taken to the hospital and treated for a broken clavicle. The entire incident was captured on video and Officer Kroger and the City of Cincinnati hid the video from D.L. in order to coerce a plea to cover up Officer Kroger's unconstitutional actions. There is a pattern and practice of tasing Black children in the City of Cincinnati. From 2013 through May 2, 2017 City of Cincinnati officers tased 85 children. Ninety four percent of those children were Black. Plaintiffs bring this case seeking fair compensation and an end to the racial profiling and disproportionate use of force against Black children by the City of Cincinnati and Officer Kroger.

## II. JURISDICTION AND VENUE

2. Jurisdiction over the federal civil rights claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a). Venue is proper in this division.

## III. PARTIES

3. Plaintiff D.L. is a minor. He is a Black resident of Cincinnati, Ohio.

4. Diondre Lee is the father of D.L. He is a Black resident of Cincinnati, Ohio.

5. Antionette Lee is the mother of D.L. She is a Black resident of Cincinnati, Ohio.

6. Defendant Kevin Kroger is a White male and was at all times relevant to this action a police officer employed by the City of Cincinnati. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacity.

7. Defendant City of Cincinnati is a unit of local government organized under the laws of the State of Ohio. Defendant City is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

### IV. FACTS APPLICABLE TO ALL CLAIMS

8. D.L. was only 14-years old, five feet, five inches (5'5"), and weighed one hundred twenty (120) pounds at the time of this incident. D.L. was a student at Western Hills High School and actively involved in sports. D.L. played football, basketball, and baseball. D.L. stayed out of trouble and had never been in trouble with the law before. He was a typical 14-year old boy who liked sports and to spend time with his friends.

9. D.L. was hanging out at a friend's house after school on March 2, 2017. D.L.'s friend lived in the Eagle Watch Apartments in Cincinnati.

10. The two boys decided to go outside as the weather was nice.

11. As they went outside, they took a bag of garbage out from the house, took the garbage to the dumpster and walked back to the apartment building.

12. The two boys were by themselves the entire time and at no time interacted with anyone else.

#### A. Officer Kroger Had No Reasonable Belief That D.L. Was A Suspect In A Crime

13. On March 2, 2017, Officer Kevin Kroger ("Officer Kroger") learned of a stolen vehicle and a felonious assault. Officer Kroger knew that a vehicle had been stolen on March 1, 2017.

Officer Kroger also knew that a vehicle matching the description of the stolen vehicle was suspected to have been involved in a felonious assault where gunshots were fired from the vehicle. The alleged felonious assault occurred hours before Officer Kroger came on shift. Officer Kroger also had a description of a suspect.

14. As he patrolled his district, Officer Kroger was on the lookout for the stolen vehicle.

15. A little after 6:30 p.m. on March 2, 2017, Officer Kroger located the vehicle parked at the Eagle Watch Apartments on Sunset Ave., about a mile away from where both crimes had occurred. Eagle Watch Apartment Complex is comprised of several buildings. Each building has multiple apartment units. All the buildings share a large parking lot. The vehicle was in the large shared parking lot.

16. Officer Kroger exited his cruiser to see if anyone was inside the stolen vehicle. The vehicle was not occupied. Officer Kroger saw no one in the vehicle nor did Officer Kroger see anyone exit the vehicle.

17. As Officer Kroger inspected the stolen vehicle, three Black males exited one of the apartment buildings. Officer Kroger believed that one of the three males allegedly matched the description of the individual involved in the earlier felonious assault.

18. Officer Kroger knew that D.L. was not in that group of three males.

19. Officer Kroger falsely claimed D.L. was part of the group of three other Black boys, one of whom met the description of the felonious assault suspect. The video[1] clearly shows D.L. was only with his single friend, and not with the three other Black boys at Ex. A time code 18:40:56.

---

[1] Exhibit A is the video of Officer Kroger's encounter with D.L. from Officer Kroger's body worn camera. Many civil complaints are now challenged as failing to state a claim under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell-Atlantic v. Twombly*, 550 U.S. 544 (2007). In response to such motions plaintiffs must demonstrate that allegations are "plausible." *IQBAL*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. There is no better way to demonstrate the plausibility of a fact than a video of the events in question. *See e.g. Scott v. Harris*, 550 U.S. 372, 381 (2007) (videotape controlled over contradicting testimony); *Marvin v. City of Taylor*, 509 F. 3d 234, 239 (6th Cir. 2007) (same). Exhibit A will be manually filed.

### B. Officer Kroger Stopped D.L. for Being a Black Male

20. Minutes later, D.L. and his friend exited the apartment building to take the garbage to the dumpster.

21. As the two boys walked outside to the dumpster, the police were clearly visible to them and they did not hesitate to walk past the officer. They walked outside from the building, took the trash to the dumpster, walked back toward the apartment building, and stood outside talking to one another in sight of the officer.

22. D.L. showed no reason for an officer to think he was suspicious or armed. D.L. did not carry a weapon, did not act like he was carrying a weapon, made no threats, and did not engage in threatening behavior.

23. Officer Kroger approached the two boys and motioned for them to come over to him. The boys complied.

24. Officer Kroger questioned the two boys about where they lived. They complied and answered his questions.

25. Officer Kroger then directed the two boys to step to the side. They complied.

26. At this point, Officer Kroger knew a) D.L. did not exit the apartment building with the other three boys, b) neither D.L. or his friend fit the description of the suspect in the felonious assault,[2] c) D.L. and his friend had only taken a bag of garbage to the dumpster and returned back by the building they had exited from, d) D.L. saw the police and remained outside and visible to them even before being approached, e) D.L. had followed all of Officer Kroger's commands, and f) he had no reason to believe D.L. was armed or a threat to himself or others.

---

[2] At time code 19:06:11 Officer Kroger was interviewed about the incident by his Sergeant. He was asked specifically "did that guy you tased match any of the description or just because you seen him coming out of the building?" Officer Kroger admitted that D.L. did not match any description of the suspect.

27. The only similarity between the suspect and D.L. is that they are both young Black males.

28. It is common practice, policy and custom in the Cincinnati Police Department for officers to stop Black children for being Black. This unconstitutional policy of treating Black children differently than White children was the moving force behind Officer Kroger's decision to stop D.L.

### C. Officer Kroger Used Excessive Force on D.L. each time he Tased D.L.

29. After D.L. complied with all of Officer Kroger's commands, and without any reason, Officer Kroger grabbed D.L., pulled D.L. by his sweatshirt toward him, and ordered him to put his hands on his head.

30. Confused, unsure, and scared about why he was being stopped, grabbed, and about to be frisked by the officer, D.L. asked Officer Kroger to get off of him. When Officer Kroger did not let D.L. go, D.L. pulled away and ran. Officer Kroger was no more than 10 feet behind D.L.

31. Officer Kroger tased D.L. within eight seconds from the time D.L. started to run. Officer Kroger never told D.L. to stop. Although, later on Officer Kroger lied to his sergeant, falsely stating that he had ordered D.L. to stop. (See Ex. A at time code 19:05:37).

32. Officer Kroger had the opportunity but without warning or justification, Officer Kroger shot D.L. with his TASER device striking D.L. in his back.

33. D.L. immediately dropped to the pavement. He hit the pavement so hard that his body bounced.

34. Officer Kroger knowingly violated the City of Cincinnati Police Department's use of force policy by not warning D.L. of the potential TASER deployment if he did not stop.

35. Officer Kroger knowingly violated the City of Cincinnati Police Department's use of force policy because there was no reason to tase D.L. and there were no exigent circumstances to justify his failure to warn of the TASER deployment.

36. Upon information and belief, the taser that was used on D.L. was an X26 TASER.

37. The X26 TASER device deployed by Officer Kroger delivers a 1200-volt, low ampere electrical charge through wires and probes and into the muscles of the person struck by the TASER. "The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body." *Brown v. Chapman*, 417 F. 3d 447, 459 (6th Cir. 2016).

38. As a result of being struck by the TASER, D.L. immediately lost control of his body, rolled down a hill, bounced and fell to the pavement without breaking his fall. His body convulsed from the power of the TASER discharge.

39. Officer Kroger knew that D.L. was injured as he screamed out in pain.

40. While D.L. was down on the ground, not fleeing, not resisting, not threatening anyone, expressing that he was clearly in pain, surrounded by other officers, and verbalizing that he surrendered, Officer Kroger tased D.L. a second time.

41. While D.L. was still on the ground, Officer Kroger threatened to tase D.L. two additional times, once pushing the taser into D.L.'s chest. D.L. was legitimately afraid for his life as a direct and proximate cause of Officer Kroger's actions.

42. D.L. was handcuffed behind his back, in excruciating pain, knowing something was wrong with his shoulder, pleaded with the officers to get him up from the ground.

43. D.L. was searched and no weapons were found.

44. D.L. was then put in the back of the police cruiser. D.L. repeatedly complained that he was in pain. As D.L. sat in the backseat of the police cruiser, Officer Kroger laughed with fellow officers at how hard D.L. hit the ground and joked that "**he bounced … yea, he hit real hard**."

45. When Officer Kroger was notified that the medic on scene recommended D.L. be transported to the hospital for a possible broken collarbone, Officer Kroger was pleased he had injured D.L. and exclaimed, "**Oh! Awesome!**"

### D. Kroger Violated the City of Cincinnati Use of Force Policy

46. Officer Kroger knowingly did not comply with the City of Cincinnati Police Department's use of force policy which requires that officers must consider factors such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by fleeing. The use of a TASER is not warranted where an individual is simply fleeing, absent additional justification. There were no circumstances that would permit a reasonable officer to use the taser the first time or the second time.

47. Cincinnati Police Officers are expected "to employ the least coercive enforcement directives available to properly address the situation" when dealing with youth.

48. D.L. had committed no crime nor would a reasonable officer consider that he was involved in the car theft that occurred the day before or the felonious assault that had occurred several hours earlier. Nor would any reasonable officer consider D.L. had committed one of the crimes Officer Kroger was investigating based solely on the fact that D.L. was a Black youth.

49. After the tasing, Officer Kroger was interviewed on his body camera by a sergeant. The sergeant specifically asked Officer Kroger whether D.L. match the description of any suspect. Officer Kroger admitted that D.L. did not match the description. (Ex. A Timecode: 19:06:12)

50. Officer Kroger admitted that he did not know whether D.L. was at all associated with the vehicle. (Ex. A Timecode 18:52:47).

51. Officer Kroger admitted that when he arrived in the apartment complex the vehicle was unoccupied. (Ex. A Timecode 18:55:43).

52. Officer Kroger admitted that he never saw D.L. with the other group of three boys. (Ex. A Timecodes 18:46:03, 18:54:07, 19:04:31, 19:04:43, 19:05:08, 19:08:05)

53. Officer Kroger twice admitted to his superior officers what transpired and never expressed that D.L. was a threat to himself or others, or that he thought D.L. was armed. The supervisors did not question Officer Kroger further or discipline him for his admissions of not following policy and lacking grounds to use force on D.L.

### E. Officer Kroger and the Cincinnati Police Department Hid Exculpatory Evidence to Coerce a Plea and the City of Cincinnati Failed to Conduct a Meaningful Investigation

54. When officers contacted D.L.'s parents to inform them that he was in custody, the officer lied to D.L.'s parents and said D.L. was seen exiting the stolen vehicle.

55. As D.L.'s case advanced through juvenile court, his attorney filed a demand for discovery. A demand for discovery was the only manner in which D.L. could obtain exculpatory evidence held by the Cincinnati Police Department during the active juvenile court case.

56. Upon information and belief the Cincinnati Police Department and Officer Kroger did not inform the prosecution or D.L.'s attorney that there was a video of the police encounter. Nor did the Cincinnati Police Department turn over the video of the incident. The video of the incident clearly corroborated D.L.'s version of events that he was not in the vehicle and included Officer Kroger's confession that D.L. did not match any description of the suspect, that D.L. was not seen in the car, and that D.L. was not with the other group of three boys.

9

57. The Cincinnati Police Department did not disclose to D.L. or his parents that it was untrue that D.L. was seen exiting the stolen vehicle.

58. Faced with having no video evidence to support his version of events and faced with the reality that the juvenile court would likely believe the word of an adult police officer over that of a 14-year old, D.L. pled to amended charges instead of challenging the stop, detention, and arrest through a motion to suppress and/or a full trial.

59. D.L., his family, and his legal team did not learn that there was a video of the incident until well over a year after D.L.'s juvenile case had ended.

60. D.L. learned of the video when a news reporter brought it to his family's attention in Fall of 2018.

61. Upon information and belief, the video was not produced because it clearly showed that D.L. should not have been stopped by Officer Kroger, and there was no support for the charges against D.L. If the Cincinnati Police Department had turned over the video it would have exposed that all of Officer Kroger's actions related to and occurring after the stop were improper; that his actions were in violation of Cincinnati Police Department policies; that his actions were unconstitutional; and that the resulting charges were unlawful.

62. The City of Cincinnati has an unwritten policy, practice, or custom to hide exculpatory evidence of their officers' use of excessive force.

63. Additionally, the City of Cincinnati ratified Officer Kroger's actions by failing to conduct a meaningful investigation into the incidents surrounding the racial profiling, stop, use of excessive force, assault and battery against D.L. Officer Kroger clearly lied in the preparation of his incident report which states that he "observed five black male teenagers walking together." Officer Kroger lied about this fact to cover up his unlawful stop, arrest and use of force against

10

D.L. Had the City of Cincinnati conducted a meaningful investigation, it would have found false, conflicting testimony by its officer regarding his basis for stopping D.L. and alleged justification into the use of force.

    **F. Policies, Practices and Culpable Conduct of Racial Bias in Policing Black youths in the City of Cincinnati.**

64. From January 1, 2013 through May 2, 2017, the City of Cincinnati Police Department tased 85 children. The records show 80 of the 85 - 94% - of the children were Black and that 38 of the children were between the ages of 11 and 15.

65. Several of those tasings resulted from efforts to arrest children suspected of shoplifting or other minor crimes.

66. In October 2016, a Cincinnati police officer tased a 16-year-old Black youth who was suspected of loitering and littering and walked away when officers called to him.

67. In July 2016, a Cincinnati Police officer tased a 17-year-old Hispanic youth suspected of theft at a gas station.

68. In July 2016, a Cincinnati Police officer tased a 15-year old Black youth recognized as having warrants for his arrest.

69. In September 2015, a Cincinnati Police officer tased a 17-year-old Black youth suspected of theft at a Wal-Mart.

70. In July 2014, a Cincinnati Police officer tased a 14-year-old Black youth suspected of smoking marijuana.

71. In August 2013, a Cincinnati Police officer tased a 17-year-old Black youth suspected of theft from a stereo store.

72. In August 2013, a Cincinnati Police officer tased a 16-year-old Black youth suspected of gambling.

73. An analysis conducted by the City of Cincinnati revealed that in 2017 more than 89% of the youth arrested in the City were Black. The population of the City is only 43.1% Black. This statistic is consistent with the percentage of Black youth arrested from 2012 through 2016, which ranged from 85% to 90%.

74. The City has a custom of disproportionately arresting and using excessive force on children of color subjecting them to disparate enforcement of the law and unnecessary trauma.

75. The City has failed to adequately train and supervise officers to interact with youth in a bias free manner and to use trauma informed strategies that promote safety while minimizing trauma to vulnerable children.

76. City training and supervision is inconsistent with written policy by encouraging the use of excessive force to protect property when the trauma caused by the force far exceeds the governmental purpose in protecting property.

77. At the time of this use of force, the City of Cincinnati Police Department Use of Force Policy and related training materials authorized use of the TASER on children as young as seven-years-old.

78. At the time of this use of force, the City of Cincinnati Police Department had a custom of deploying Tasers against children.

79. The policy, practice, custom and training of the Defendant City of Cincinnati regarding the deployment of Tasers against youths was a moving force behind the excessive force used on D.L. by Officer Kroger in this case.

### G. Plaintiffs were Harmed by Defendants' Conduct

80. As a further direct and proximate result of Defendants' actions, D.L. suffered severe pain, physical injuries, humiliation, embarrassment and emotional distress from the use of force.

81. The City of Cincinnati Fire Department responded to the scene to evaluate D.L. and remove the TASER barbs from his back. D.L. was then transferred to Cincinnati Children's Hospital. D.L. was diagnosed and treated for having a fractured right clavicle.

82. In addition to the physical clavicle injury, D.L. has been diagnosed with post-traumatic stress disorder from the tasing and arrest, and experiences high anxiety when around authority figures.

83. D.L. has become withdrawn from his family. He takes no interest in many of the activities his family used to enjoy together.

84. Officer Kroger knew or should have known that using excessive force by tasing D.L. would result in severe emotional distress for a child his age.

85. D.L.'s parents are distraught that they have been unable to help their child recover from this incident. They have suffered severe emotional and mental distress as a result of Officer Kroger's actions, including his hiding exculpatory evidence.

86. All the injuries and damages described above were proximately caused by the wrongful acts of the Defendants.

## V.     FIRST CAUSE OF ACTION – 42 U.S.C. §1983

87. Plaintiff restates Paragraphs 1 through 86 as if fully rewritten herein.

88. Defendants Kroger and the City of Cincinnati have, under color of state law, deprived Plaintiff D.L. of rights, privileges, and immunities secured to the Plaintiff by the Fourth and Fourteenth Amendment to the United States Constitution, including the right to equal protection under the law and the right to be free of excessive force.

89. The policy, practice, pattern, and custom of Defendant City of Cincinnati regarding the disparate arrests of Black children and use of excessive force on children by deploying TASERS unnecessarily was the moving force behind the constitutional deprivations suffered by D.L.

90. The City of Cincinnati has failed to adequately train and supervise Cincinnati Police Officers with respect to young Black persons suspected of crime. The City has acted with deliberate indifference to the safety and rights of Black children who engage in minor violations that do not support the use of tasings and high levels of force. The City has failed to train and supervise officers to prevent racially disparate arrests and excessive force involving Black youth.

91. The City of Cincinnati ratified the unconstitutional behavior of Officer Kroger by failing to conduct a meaningful investigation into the excessive use of force against D.L.

## VI. SECOND CAUSE OF ACTION – ASSAULT AND BATTERY

92. Plaintiff restates Paragraphs 1 through 91 as if fully rewritten herein.

93. Officer Kroger knowingly, recklessly, maliciously, intentionally, and without warning or provocation caused harm to D.L. when he tased him and used excessive force.

94. Officer Kroger knowingly, recklessly, maliciously, intentionally, and without warning or provocation threatened D.L. with physical force when he pressed the taser into D.L.'s chest after D.L. was on the ground, in custody, and under control of the officers.

## VII. THIRD CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95. Plaintiff restates Paragraphs 1 through 94 as if fully rewritten herein

96. Officer Kroger knowingly inflicted emotional distress upon D.L. when he tased him twice without provocation or justification.

97. Officer Kroger knowingly inflicted emotional distress upon D.L. when he held the taser to D.L.'s chest after D.L. was on the ground, in custody, and under control of the officers.

98. D.L. believed that Kroger was going to tase him a third time.

99. D.L. was in extreme fear for his safety.

100. Officer Kroger then suppressed exculpatory Brady material to coerce a plea out of D.L.

101. D.L. was diagnosed with post-traumatic stress disorder and suffers from anxiety and depression as a result of his encounter with Officer Kroger.

102. Officer Kroger knew or should have known that extreme and outrageous conduct would cause Plaintiffs severe emotional distress

103. Officer Kroger, by his extreme and outrageous conduct, did intentionally or recklessly inflict severe emotional distress on D.L., Diondre Lee and Antionette Lee.

### VIII. FOURTH CAUSE OF ACTION – LOSS OF CONSORTIUM

104. Plaintiff restates Paragraphs 1 through 103 as if fully rewritten herein

105. D.L. is not the same child he was before he was tased and railroaded by Defendant Kroger through the juvenile justice system.

106. He is distrustful of adults and law enforcement. He has trouble with authority figures and experiences palpable anxiety around them. This distrust manifests itself in all facets of D.L.'s life, including at home and school.

107. D.L. has shut down emotionally as a result of the treatment he suffered at Officer Kroger's hands. The wrongful, intentional, reckless acts of Officer Kroger proximately caused Plaintiffs Diondre and Antionette Lee to be robbed of their son's love, society, companionship, affection, and comfort.

### IX. JURY DEMAND

108. Plaintiffs request a jury trial on all claims triable to a jury.

# X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A. Compensatory damages in an amount to be shown at trial;

B. Punitive damages against Defendant Kroger (not the City of Cincinnati) in an amount to be shown at trial;

C. Reasonable attorney's fees, costs and disbursements;

D. Prejudgment interests; and

E. Such additional relief as this Court deems just and proper.

Respectfully submitted,

/s/ Janaya Trotter Bratton
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiffs
Janaya Trotter Bratton (0084123)
Attorney for Plaintiffs
Gerhardstein & Branch Co. LPA
441 Vine St., Suite 3400
Cincinnati, Ohio 45202
Tel (513) 621-9100
Fax (513) 345-5543
jbranch@gbfirm.com
jtbratton@gbfirm.com

/s/ Theodore P. Cummings
Theodore P. Cummings (0075790)
Attorney for Plaintiffs
Admitted pro hac vice
Cummings Law, LLP
707 E. McMillan Street
Cincinnati, Ohio 45206
Tel (513) 273-7989
attorney@cummingslaw.net

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2019, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

s/ Janaya Trotter Bratton<br>Attorney for Plaintiffs